UNITED STATES of America,
Appellee,

v.

William HENRY; Betty Henry, also known as Sealed Deft. # 6; Dennis J. Dattolo, also known as Sealed Deft. # 5; Anthony Santamaria, also known as Sealed Deft. # 3; Raymond A. Newkirk, also known as Sealed Deft. # 4; Michael Gonzalski, also known as Sealed Deft. # 5, Defendants,

Edmund L. Panek, also known as Sealed Deft. # 4, also known as Sealed Deft. # 2, and Alexander Panek, also known as Phil Panek, also known as Sealed Deft. # 1, Defendants–Appellants.

Docket Nos. 00–1516, 00–1558.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 14, 2001.

Decided: April 2, 2003.

John W. Mitchell, New York, New York, for Defendant–Appellant Edmund L. Panek.

David G. Secular, Assistant Federal Public Defender (Alexander Bunin, Federal Public Defender, on the brief), Syracuse, New York, for Defendant–Appellant Alexander Panek.

Brenda K. Sannes, Assistant United States Attorney (Joseph A. Pavone, United States Attorney for the Northern District of New York, on the brief), Syracuse, New York, for Appellee.

Before: FEINBERG, POOLER, SOTOMAYOR, Circuit Judges.

POOLER, Circuit Judge.

Alexander Panek and Edmund Panek appeal from the judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Judge* ) after a jury convicted both Alexander Panek and Edmund Panek of conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846 and Alexander Panek of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). The district court sentenced Alexander Panek and Edmund Panek to 151 months and 78 months imprisonment, respectively. On appeal, defendants-appellants argue that: 1) their sentences are unconstitutional pursuant to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); 2) there was insufficient evidence to support Alexander Panek's conviction for conspiracy to launder monetary instruments; 3) the district court erred by failing to disclose the entire contents of a jury note; 4) the district court erred in giving an *Allen* charge when three of the jurors were merely "undecided;" 5) the district court erred by denying defense counsel the right to review the *Allen* charge before giving it to the jury; 6) the *Allen* charge was impermissibly coercive; 7) the district court erred in holding that the defendants were not entitled to *pro tanto* credit for monies the government collects from their co-conspirators; and 8) the district court erred in denying Edmund Panek's motion for a mistrial based upon the government's inclusion of the money laundering charge, which was dismissed after its case-in-chief. We find defendants-appellants' contentions to be without merit, and we affirm their convictions and sentences.

**BACKGROUND**

In 1997 and 1998, the United States Attorney's Office for the Northern District of New York charged Alexander Panek, Edmund Panek, Anthony Santamaria, Raymond Newkirk, Michael Gonzalski, William Henry, Betty Henry, and Dennis Dattolo with various criminal acts arising out of an alleged conspiracy to distribute marijuana. As relevant to this appeal, Santamaria, Newkirk, William and Betty Henry, and Dattolo all pleaded guilty prior to trial and were sentenced to various terms of imprisonment. As part of their respective plea agreements, the pleading defendants agreed that the "gross proceeds" of the marijuana conspiracy amounted to $2,000,000 and that each would be jointly and severally liable for this amount.

Alexander Panek and Edmund Panek went to trial June 22, 1999, and stipulated to chemists' reports verifying the authenticity of the marijuana that the police seized in connection with this case. Alex-

ander Panek was charged with one count of conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846; two counts of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h); and one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Edmund Panek was charged with one count of conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846 and one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).

At the close of its case-in-chief, the district court granted the government's motion to dismiss Count Two of the indictment, the sole money laundering conspiracy charge against Edmund Panek. Edmund Panek moved for a mistrial, arguing that the government's references in its opening statement to his involvement in the money laundering conspiracy prejudiced the jury against him with respect to the remaining marijuana conspiracy charge. The court denied Edmund Panek's motion.

The jury began deliberating July 7, 1999, and, at the end of the next day, sent the district court a note stating:

We are not able to reach a unanimous vote on Count 1 on Edmund Panek. Do we continue to deliberate? There are no requests for additional explanations on issues. Does 3 undecided, 9 guilty indicate an "automatic" not guilty? An automatic anything? All other counts have been decided.

The district court met with the parties in chambers and read an edited version of the note. The court omitted the portion of the note referring to the numerical division. The court also did not inform the parties that it had redacted the note. The district court then informed the parties

that it intended to give the jury a "modified *Allen* charge" the next morning. The district court told Edmund Panek's defense counsel that he could review the charge if he reported to chambers shortly before 8:30 the next morning. When counsel arrived at chambers the morning of July 9, 1999, however, the district court told him that the charge was "still being edited and reviewed" and was not available for inspection. Almost immediately thereafter, at 8:37 a.m., the district court delivered the following *Allen* charge to the jury:

As I've instructed you in my charge, in order to return a verdict in this case, each juror must agree as to each count with respect to each defendant. In other words, your verdict must be unanimous. You should, therefore, consider all the evidence in the case and fully deliberate upon that evidence in a conscientious manner. Remember at all times that the Government has the burden of proof beyond a reasonable doubt. Also remember your oath, that when you were sworn in as jurors, and this panel was picked, your oath was that you would try this case and attempt to render a true verdict according to the evidence and the law, keep that in mind.

Furthermore, although each juror must decide the case for him or herself, this should be done after an impartial consideration of all the evidence with your fellow jurors.

Now, in the course of your deliberations as a juror, you must examine everybody's point of view. You should not hesitate to reexamine your own views and to change your opinion if you are convinced that it is erroneous. Each juror who finds him or herself in a minority should consider his or her view in light of the opinion of the jurors in the majority; conversely, each juror finding

him or herself in the majority should give equal consideration to the view of the minority.

Now no juror should surrender his or her honest conviction as to the weight or the effect of the evidence to his fellow or her fellow jurors or for the purpose of returning a verdict. But remember also that after full deliberation and consideration of all the evidence, it is your duty to try to agree upon a verdict if you can do so without violating your individual judgment and conscience.

Now this has been a fairly long trial, about three weeks, and at some considerable expense and money and human effort, so if your deliberations do not end in agreement on a verdict, the case is necessarily left open and undecided, and in all likelihood it would have to be tried again before another jury, a jury which would have to be selected in the same manner you were. There's no reason to believe that this case would be better tried or would reveal any more or different evidence than you have heard. Nor is there any reason to believe that 12 different people would be more impartial or pay more attention to the evidence or make a greater effort to resolve the issues.

Now these considerations that I just laid out for you are but a reminder that your task, although not an easy one, is one of making a conscientious decision, which I feel you are fully equipped to make. And I hope that what I've said will help you deal with the differences that are preventing you from reaching an agreement. But you are free to disregard everything I've said, except the law as I've given it to you, and you must apply the law to the facts as you find them to be.

I would like to suggest at this time that you return to the jury room and reflect upon what I've said and resume your deliberations for such time as you, in your judgment, feel to be reasonable with the help that you can conscientiously reach an agreement.

Now again, it's up to you, you're the jurors, you are the judges of the facts, but these comments are just to give you some guidance as to, again, remind you what your responsibilities are and hopefully maybe you can resolve the issues that are keeping you separate and keeping you from [a] unanimous verdict. But if that isn't the case, then you let me know, all right.

After the jury was dismissed, defense counsel objected to the district court's failure to afford him the opportunity to review the charge before it was given to the jury. Defense counsel also objected to the "minority/majority" language in the charge, as well as the district court's failure to instruct the jury that it was permitted to return a partial verdict.

On July 9, 1999 at 1:57 p.m., approximately five hours after the court administered the *Allen* charge, the jury convicted Alexander Panek and Edmund Panek of conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846. The jury also convicted Alexander Panek on one count of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). Using a special verdict form, the jury concluded that the Paneks and their coconspirators obtained $400,000 in gross proceeds from their participation in the marijuana conspiracy.

Following the verdict, Edmund Panek moved for a new trial pursuant to Federal Rule of Criminal Procedure 33 based upon: 1) the district court's failure to reveal the entire contents of the jury note; 2) the district court's failure to afford counsel the opportunity to review the *Allen* charge; 3)

the district court's decision to administer the *Allen* charge when three jurors were merely "undecided" rather than deadlocked with the other jurors; and 4) the district court's inclusion of allegedly coercive language in the charge. The district court rejected these arguments. The court held that it "exercis[ed] its discretion[ ][and] determined that it would be improper to reveal such split to Defendants and their counsel, especially in light of the fact that one of the jurors resided in the same general neighborhood as Defendants." The district court also held that the *Allen* charge was "almost straight from the pattern jury instructions" and, thus, no prejudice resulted from the failure to allow for review. Finally, the court concluded that the charge was appropriate and within its discretion because "[w]hile the jury might not have used the word 'deadlocked,' the Court believes that it was clear from the note that they were unable to come to a unanimous decision, and all counsel [were] aware of this."

At sentencing, the district court made its own findings of fact, based upon a preponderance of the evidence, and determined that Edmund Panek was responsible for the distribution of between 400 and 700 kilograms of marijuana and that Alexander Panek was responsible for the distribution of between 700 and 1,000 kilograms of marijuana. The government also documented that Alexander Panek has a prior conviction for a felony drug offense. Accordingly, the district court sentenced Edmund Panek to 78 months imprisonment and Alexander Panek to 151 months imprisonment. The district court sentenced Alexander Panek to serve a concurrent term of 151 months imprisonment on the money laundering conspiracy conviction. The district court also issued a forfeiture order holding defendants-appellants jointly and severally liable for $400,000. The court also held that the government need

not credit any assets collected from defendants-appellants' co-conspirators until the government collects $1,600,000.

Defendants-appellants appeal the convictions, sentences, and forfeiture order. Defendants-appellants argue that: 1) their sentences are unconstitutional pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); 2) there was insufficient evidence to support Alexander Panek's conviction for conspiracy to launder monetary instruments; 3) the district court erred by failing to disclose the entire contents of a jury note; 4) the district court erred in giving an *Allen* charge when three of the jurors were merely "undecided;" 5) the district court erred by denying defense counsel the right to review the *Allen* charge before giving it to the jury; 6) the *Allen* charge was impermissibly coercive; 7) the district court erred in holding that the defendants were not entitled to *pro tanto* credit for monies the government collects from their co-conspirators; and 8) the district court erred in denying Edmund Panek's motion for a mistrial based upon the government's inclusion of the money laundering charge, which was dismissed after its case-in-chief. We find defendants-appellants' contentions to be without merit, and we affirm their convictions and sentences.

## DISCUSSION

### I. The *Apprendi* Issue

■ Defendants-appellants argue that their sentences on the charge of conspiracy to possess with intent to distribute and to distribute marijuana are unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) because the government did not charge in the indictment and the jury did not find beyond a reasonable doubt the quantity of marijuana involved in the conspiracy. In

*United States v. Thomas*, 274 F.3d 655, 660 (2d Cir.2001) (en banc), this Court held that "if the type and quantity of drugs involved in a charged crime may be used to impose a sentence above the statutory maximum for an indeterminate quantity of drugs, then the type and quantity of drugs is an element of the offense that must be charged in the indictment and submitted to the jury." Because defendants-appellants did not raise any valid *Apprendi*-related objections below, we review their claims only for plain error. *United States v. Outen*, 286 F.3d 622, 634 (2d Cir.2002) (citing *Thomas*, 274 F.3d at 666).[1] Accordingly, this Court must determine whether there was: 1) an error; 2) that was plain; 3) that affected defendants-appellants' "substantial rights;" and 4) that "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (internal quotation marks omitted).

It is clear that defendants-appellants' sentences on their marijuana conspiracy convictions were in error. This Court recently held that the statutory maximum sentence for offenses under 21 U.S.C. § 841 involving an indeterminate amount of marijuana is 60 months, as prescribed by 21 U.S.C. § 841(b)(1)(D). *Outen*, 286 F.3d at 636–39.[2] The statutory maximum sentence with respect to Alexander Panek's marijuana conviction was 120 months, as he has "a prior conviction for a felony drug offense." 21 U.S.C. § 841(b)(1)(D). However, defendants-appellants' sentences exceeded this statutory maximum sentence, as Alexander Panek and Edmund Panek were sentenced to 151 months and 78 months imprisonment, respectively. This error is also "plain" in light of *Apprendi* and *Thomas*. We must therefore decide whether this error affected defendants-appellants' substantial rights. "Under our 'modified plain-error rule,' applied where, as here, 'the source of plain error is a supervening decision,'[3] the government, not the defendant, bears the burden to demonstrate that the error ... was harmless." *Outen*, 286 F.3d at 639 (quoting *United States v. Monteleone*, 257 F.3d 210, 223 (2d Cir.2001), cert. denied *sub nom. Russo v. United States*, 535 U.S. 1042, 122 S.Ct. 1808, 152 L.Ed.2d 664 (2002)).[4]

1. Although the district court considered whether the weight of the drugs must be submitted to the jury, the government, not defendants-appellants, raised the issue. Specifically, the district court stated:

We've just been discussing the application or the lack of application of *Jones v. United States*, [a] Supreme Court decision that came down this past March as to whether or not the weight of the drugs conspired to be possessed and distributed is a factor that must be submitted to the jury based upon this case. And I've looked at the case, and I decided no, it is not. I think the weight of [the] drugs ... [is] not an element of the crime charged. Furthermore, it wasn't even charged in the indictment. It would have to be charged in the indictment as an element for this Court to submit [the issue] to a jury. Even though it's not been requested by the defense, the Government has brought it to my attention for consideration, and I found it is not applicable. I do not intend to charge the jury as to weight.

Moreover, defendants-appellants failed to object to the district court's decision not to charge the jury to determine the weight of the marijuana.

2. The charge of conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846 carries with it the same penalties as those prescribed for the underlying offenses under 21 U.S.C. § 841. *See* 21 U.S.C. § 846.

3. Defendants-appellants were convicted July 9, 1999, and *Apprendi* was decided June 26, 2000.

4. In *Outen*, this Court assumed without deciding that the modified plain-error rule remains

■ We find that the sentencing error was not prejudicial with respect to Alexander Panek. This Court has held that an erroneous sentence on one count of a multiple-count conviction does not affect a defendant's substantial rights where the total term of imprisonment remains unaffected. *Outen*, 286 F.3d at 640 (citing *United States v. Rivera*, 282 F.3d 74, 77–78 (2d Cir.2000), cert. denied *sub nom. Cook v. United States*, — U.S. —, 123 S.Ct. 332, 154 L.Ed.2d 228 (2002)). In the instant case, the district court sentenced Alexander Panek to serve concurrent terms of 151 months imprisonment on each of his convictions. Alexander Panek does not maintain that his sentence on the money laundering conviction was unconstitutional, as the statutory maximum sentence on this charge is 240 months imprisonment. *See* 18 U.S.C. § 1956(a)(1) & (h). Moreover, this Court declines to reverse Alexander Panek's conviction for conspiracy to launder monetary instruments, as will be discussed at Point II below.

However, Alexander Panek argues that the money laundering conspiracy conviction cannot independently justify the imposition of a 151 month sentence. The district court concluded that the total offense level was 33, based upon a base offense level of 30, referable to the amount of marijuana the district court found attributable to this defendant, and a 3–point upward adjustment for his role in the offense. The district court also concluded that Criminal History Category II accurately represented Alexander Panek's past criminal conduct. Based upon these calculations, the district court determined that the Sentencing Guidelines range was 151 to 188 months imprisonment, and it sentenced Alexander Panek to two concurrent terms of 151 months imprisonment.

Alexander Panek challenges the district court's calculations. Given the marijuana conspiracy conviction's statutory maximum, Alexander Panek maintains that the money laundering conviction carries with it the highest offense level and governs the sentence. He thus concludes that the base offense level should not have been more than 26, yielding a range of 70 to 87 months. However, the district court correctly determined that the marijuana conspiracy conviction is the controlling offense, because a statutory maximum sentence is not implicated until after the sentencing guideline range has been determined. *United States v. Feola*, 275 F.3d 216, 219 (2d Cir.2001) (holding that conviction for willfully failing to file federal income tax return was controlling offense, even though the prescribed sentencing range of 24–30 months exceeded the statutory maximum 12–month sentence). In sentencing a defendant convicted on multiple counts, counts "involving substantially the same harm" are "grouped" together. *Id.* at 219 (quoting U.S.S.G. § 3D1.2). "Next, an offense level for each group is determined ... by ... using the offense level for the aggregate quantity of drugs or money, enhanced by relevant conduct. Next, a combined offense level is determined by using the offense level for the group with the highest level and then adjusting upward depending on the offense levels of the other groups. Next, a total punishment is selected, using the sentencing range prescribed for the combined offense level and the appropriate criminal history category." *Id.* (citations omitted). Finally, and most important, "sentences

good law in light of *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). *See Outen,* 286 F.3d at 639 n. 18. We do the same, as the government does not

raise the issue. Nevertheless, the outcome would remain the same under a traditional plain error analysis. *See Thomas,* 274 F.3d at 668–69 & n. 15.

are imposed by sentencing the defendant to the prescribed total punishment on each count, up to the statutory maximum for that count. . . ." *Id.* (internal citations omitted). Thus, the mere fact that the marijuana conspiracy conviction is subject to a statutory maximum would not change the initial calculation of the applicable guideline range. *See id.* Rather, a district court would sentence a defendant pursuant to the guideline range, to the extent that the sentence on each count does not exceed the applicable statutory maximum. Therefore, the correct sentence is 151 months on the money laundering charge and 120 months on the marijuana charge. Accordingly, any *Apprendi* error with respect to Alexander Panek's sentence on the marijuana conspiracy charge will not affect his total term of imprisonment, rendering any such error harmless.

■ We also find that Edmund Panek's sentence does not undermine the fairness and integrity of the proceedings. In *Thomas,* we held that where a defendant "squarely placed drug quantity at issue," a plain *Apprendi* error "seriously affect[ed] the fairness of the proceedings." 274 F.3d at 671 (internal quotation marks omitted). However, in rare cases, where the evidence of drug quantity is both "overwhelming" and "essentially uncontroverted," the failure to submit the issue of quantity to the jury does not undermine the fairness and integrity of the judicial proceedings, and we will not exercise our discretion to correct a sentence. *United States v. Doe,* 297 F.3d 76, 91–92 (2d Cir. 2002) (quoting *United States v. Cotton,* 535 U.S. 625, 122 S.Ct. 1781, 1786–87, 152 L.Ed.2d 860 (2002)); *see also United States v. Guevara,* 298 F.3d 124, 126–27 (2d Cir.2002). In *Cotton,* the Supreme Court held that "[s]urely the grand jury, having found that the conspiracy existed,

would have also found that the conspiracy involved at least 50 grams of cocaine base," where it was essentially uncontroverted that the conspiracy involved approximately 1,680 grams of cocaine base. *Cotton,* 122 S.Ct. at 1786.

Similarly, in the instant case, there is overwhelming evidence that it was foreseeable to Edmund Panek that the conspiracy would distribute at least 50 kilograms of marijuana, which triggers the statutory maximum sentence of 20 years imprisonment. *See* 21 U.S.C. § 841(b)(1)(C) & (D). William Henry testified that he purchased between 225 and 400 pounds of marijuana from Edmund Panek. William McKerchie testified that Edmund Panek paid him to transport 197 pounds of marijuana from Tucson, Arizona to Syracuse, New York. Blair Priest testified that Edmund Panek paid him on five occasions to transport two to three duffle bags of marijuana from Tucson to Syracuse. David Coburn testified that he and Duane Hudson transported approximately 300 pounds of marijuana to Syracuse. According to Hudson, Edmund Panek gave Alexander Panek a paper bag containing cash for the marijuana, which Alexander Panek then gave to Hudson. Finally, Gregory Roach testified that on five to six occasions, he paid Edmund Panek for marijuana that he received from another source. Given this overwhelming evidence and the fact that Edmund Panek was, in fact, convicted of conspiring to distribute marijuana, the jury clearly would have found that Edmund Panek's offense involved at least 50 kilograms of marijuana. As such a finding would have subjected him to the 20–year statutory maximum sentence, the district court's sentence of 78 months imprisonment does not undermine the fairness and integrity of the proceedings.

Having ascertained that the evidence of drug quantity was "overwhelming," we

must consider whether it was "essentially uncontroverted." *Guevara,* 298 F.3d at 127–28. Specifically, we must consider "(a) whether there was sufficient evidence to permit a jury to find in favor of [Edmund Panek] on the omitted element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty." *Id.* at 128 ("Having searched the record, we see insufficient evidence to support a jury finding that the conspiracy did not involve more than one kilogram of heroin; the jury, having found that the conspiracy existed, would have returned a verdict that it involved more than one kilogram of heroin."). As in *Guevara,* the fact of conviction necessarily means that the jury would have concluded that Edmund Panek's offense involved at least 50 kilograms of marijuana. Indeed, Edmund Panek contended in his sentencing memorandum that, pursuant to the conviction, he could only be held responsible for McKerchie's failed delivery, which involved 197 pounds, or approximately 89 kilograms, of marijuana. Accordingly, we decline to vacate Edmund Panek's sentence.[5]

## II. Sufficiency of the Evidence of a Conspiracy to Launder Monetary Instruments

■ Alexander Panek challenges the sufficiency of the evidence to support his conviction of conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). A defendant bears a heavy burden in challenging the sufficiency of the evidence. *United States v. Diaz,* 176 F.3d

52, 89 (2d Cir.1999). Although the sufficiency of the evidence is reviewed *de novo,* the Court views the evidence in the light most favorable to the government and draws all inferences in favor of the government. *Id.; see also United States v. Szur,* 289 F.3d 200, 219–220 (2d Cir.2002). The conviction must be affirmed if "any rational trier of fact could have found the essential elements of the crime." *United States v. Amiel,* 95 F.3d 135, 141–42 (2d Cir.1996) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In order to establish that a defendant conspired to launder monetary instruments in violation of 18 U.S.C. § 1956(h), the government must show that the defendant agreed to: 1) conduct a financial transaction; 2) involving the proceeds of specified unlawful activity; 3) knowing that the property involved in the transaction represented the proceeds of some form of unlawful activity; and 4) knowing that the financial transaction was designed in whole or in part to conceal or disguise the nature, source, location, ownership, or control of those proceeds. *See United States v. Maher,* 108 F.3d 1513, 1525–27 (2d Cir. 1997) (setting out elements of substantive offense); *United States v. Wydermyer,* 51 F.3d 319, 326–28 (2d Cir.1995).[6]

The government presented sufficient evidence that Alexander Panek conspired with William Henry to launder the proceeds of marijuana sales. William Henry testified that Alexander Panek arranged the exchange of $50,000 in cash from the sale of marijuana for a cashier's check,

---

5. The government also argues that defendants-appellants stipulated that the quantity of marijuana seized exceeded fifty kilograms when they stipulated to chemists' reports verifying the authenticity of at least 246 kilograms of marijuana. However, it is clear that defendants-appellants stipulated only that the substance tested was marijuana.

6. This Court has never addressed whether proof of an overt act is a necessary element of 18 U.S.C. § 1956(h). *See United States v. LaSpina,* 299 F.3d 165, 173 n. 2 (2d Cir. 2002). We need not address this issue, as there is sufficient proof of an overt act in this case.

made payable to Henry's mother, which was used to purchase a limousine. In addition, Joseph Pfohl, an unindicted co-conspirator, testified that in June 1995, Alexander Panek asked him to assist in the purchase of a limousine. Panek told Pfohl that he and another individual had cash and wished to buy a limousine, but that they could not purchase it with cash. Panek offered to pay Pfohl $50,000 in cash in return for a cashier's check in the amount of $45,000, made out to William Henry's mother. Panek and Henry subsequently visited Pfohl's business to retrieve the check. Henry handed Panek a brown paper bag containing between $45,000 and $50,000 in cash, the proceeds of marijuana sales, and Panek, in turn, handed the bag of cash to Pfohl. Pfohl then gave the pair the cashier's check. Henry gave the check to his mother to deposit into their joint account, and he used the money to purchase a limousine in his mother's name. Henry testified that "we" obtained the cashier's check from Pfohl because he was "a legitimate big businessman and he could show where the money came from [and] we couldn't." Henry also testified that the money for the limousine was the proceeds of narcotics sales.

In March 1996, Alexander Panek helped William Henry purchase another limousine in a similar manner. Alexander Panek obtained a cashier's check in the amount of $20,000 from his credit union. Panek then delivered the check, made payable to William Henry's business, to Henry, who used it to purchase another limousine. In exchange for the cashier's check, Henry gave Alexander Panek cash and two or three checks.

Based upon this evidence, the jury reasonably could have concluded that Alexander Panek conspired with William Henry to launder the proceeds of marijuana sales by exchanging illicit cash for cashier's checks, which were then used to purchase two limousines. Both the exchange of cash for cashier's checks and the purchase of a vehicle with "monetary instruments" are financial transactions within the meaning of 18 U.S.C. § 1956. *See United States v. Griffin*, 84 F.3d 912, 926–27 (7th Cir.1996) (conversion of cash into checks); *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990) (purchase of a truck).

There is also sufficient evidence to establish that Alexander Panek knew that the funds at issue were "the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1); *see also Maher*, 108 F.3d at 1525–27 (holding that a defendant need only believe that the money was from "some form of unlawful activity" and need not know precisely what that activity was). It is undisputed that Alexander Panek knew that "Henry was also substantially involved in purchasing and distributing marijuana" and willingly participated in the elaborate transactions giving rise to the limousine purchases. Alexander Panek told Pfohl that he and Henry could not use the cash they wished to exchange for a cashier's check. The fact that William Henry handed Alexander Panek a brown paper bag containing such a large sum of cash supports the jury's conclusion that Alexander Panek knew the money came from unlawful activity. Moreover, the jury found beyond a reasonable doubt that Alexander Panek was involved in a conspiracy to distribute marijuana, also suggesting that he knew the source of his co-conspirator's cash.

There is also sufficient evidence to establish that Alexander Panek knew that the transactions at issue were intended to disguise the source of the cash. Alexander Panek knew that Henry could not spend the cash without first exchanging it for cashier's checks, evident by his comment to Pfohl. Also, the elaborate nature of the

transactions should have suggested to Alexander Panek that they were intended to make it more difficult to trace Henry's cash.

■ Finally, there is sufficient evidence to establish that Alexander Panek and William Henry had an agreement to launder the illicit cash. Alexander Panek told Pfohl that he and Henry wanted to buy a limousine but could not use cash, suggesting that Panek was an equal partner in the conspiracy. A "conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir.1997); *see also Iannelli v. United States*, 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); *United States v. Martino*, 759 F.2d 998, 1004 (2d Cir.1985). The mere fact that Panek participated with Henry in the suspicious transactions at issue suggests an agreement.

Alexander Panek argues that the government never proved that he had an interest in the transactions or profited from them. However, this Court has held that "[i]t is not necessary to charge the jury that each conspirator must be found to have a 'stake in the success' of the conspiracy." *United States v. Torres*, 901 F.2d 205, 245 (2d Cir.1990) (citations omitted); *see also United States v. Isabel*, 945 F.2d 1193, 1203 (1st Cir.1991) (citations omitted) ("[E]vidence of a financial stake in the venture is not essential to show that the defendant intended to facilitate the unlawful objective of the conspiracy."). The government need only show "purposeful behavior aimed at furthering the goals of the conspiracy." *Desimone*, 119 F.3d at 223; *see also Torres*, 901 F.2d at 245 ("It is sufficient that the defendant was not indifferent to the outcome of the venture."). Rather, the government *may* establish this element by showing that the defendant had a financial stake in the outcome of a conspiracy. *See Desimone*, 119 F.3d at 224 (holding that the defendant's "financial stake in the outcome of the negotiations constituted proof of his interest in furthering the goals of the conspiracy").

Therefore, we conclude that there is sufficient evidence to support Alexander Panek's conviction for conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h).

### III. The Jury's Note and the *Allen* Charge

■ Edmund Panek argues that the district court erred by: 1) failing to disclose the portion of the jury's note detailing the numerical division of the jury and by redacting the note without informing defense counsel; 2) administering an *Allen* charge to the jury; 3) denying defense counsel the right to review the *Allen* charge before reading it to the jury; and 4) selecting an *Allen* charge that was impermissibly coercive.[7] In general, district courts should reveal the existence and the contents of any and all jury notes to both sides and allow counsel to suggest an appropriate response. *See United States v. Robinson*, 560 F.2d 507, 516 (2d Cir.1977) (en banc) ("The Sixth Amendment and Rule 43 of the Federal Rules of Criminal Procedure require that ordinarily a message from the jury be answered in open court and that counsel be given the opportunity to be heard before the trial judge responds to the jury's questions."); *see also United States v. Ronder*, 639 F.2d 931, 934 (2d Cir.1981) ("It is settled law that messages from a jury should be dis-

---

7. This argument does not apply to Alexander Panek, as the note indicated that the jury had reached verdicts on all counts except Count One of the indictment against Edmund Panek.

closed to counsel and that counsel should be afforded an opportunity to be heard before the trial judge responds."). Specifically,

> (1) the jury's inquiry should be submitted in writing; (2) before the jury is recalled, the note should be read into the record in the presence of counsel and defendant; (3) counsel should be afforded an opportunity to suggest appropriate responses; and (4) after the jury is recalled, the request should again be read in their presence to assure that it accurately reflects their inquiry and that they all appreciate the question being asked.

*United States v. Leung*, 40 F.3d 577, 584 (2d Cir.1994) (citing *Ronder*, 639 F.2d at 934).

[11] Although the district court did not follow these procedures, the failure to disclose the existence and nature of a jury split does not necessarily constitute an abuse of discretion. *See, e.g., Robinson*, 560 F.2d at 511–12 (affirming where court revealed existence of note and its general contents but did not reveal the precise division indicated); *id.* at 524 (Oakes, J., concurring) ("The trial court here should have revealed to counsel the substance of the juror's note, *without disclosing . . . the jury vote*." (emphasis added)). In this case, the district court read the remainder of the note in its entirety and redacted only the portion that would have revealed the jury split to counsel and defendants. While the district court should have avoided the appearance of impropriety by informing counsel that it was redacting the note, the district court's failure to inform counsel of the jury split under these circumstances does not constitute an abuse of discretion.

■ Nor has Edmund Panek demonstrated prejudice as a result of the district court's failure to reveal the redacted information. *See United States v. Adeniji*, 31 F.3d 58, 65 (2d Cir.1994) (holding that non-compliance with the procedure outlined in *Ronder* "does not mandate reversal unless prejudice is shown"). Edmund Panek argues that he would not have agreed to the *Allen* charge had he known the nature of the jury split, because it was inappropriate for the court to administer the charge under these circumstances. However, trial courts generally have "broad discretion to determine under what circumstances and how the [jury] charge should be given." *Smalls v. Batista*, 191 F.3d 272, 277 (2d Cir.1999). "It has long been established that when a trial court receives notice that the jury is deadlocked it may give a charge, commonly referred to as an 'Allen' charge, that urges the jurors to continue deliberations in order to reach a verdict." *Id.* at 278. The district court has discretion to give such a charge in order to encourage a deadlocked jury to reach a unanimous verdict, *Lowenfield v. Phelps*, 484 U.S. 231, 237–38, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), provided that it does not "coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir.1991) (citations omitted). It is clear from the note that the jury was deadlocked, as it stated "[w]e are not able to reach a unanimous verdict on Count 1 on Edmund Panek." The jury also inquired whether it should continue to deliberate. Accordingly, the district court's decision to administer the *Allen* charge was not an abuse of discretion.

■ Edmund Panek argues that the district court erred by failing to allow defense counsel to review the *Allen* charge before it was given to the jury, which resulted in prejudice because the charge was impermissibly coercive. This Court has repeatedly held that defense counsel

should be afforded the opportunity to review a proposed jury instruction. *See, e.g., id.* at 1300 (holding that district court's refusal to allow defense counsel to review and comment upon *Allen* charge was "inappropriate") (citations omitted). Regardless, Edmund Panek cannot demonstrate that he was prejudiced, as the district court's charge was not impermissibly coercive. The district court properly reminded the jury that "at all times[,] . . . the Government has the burden of proof beyond a reasonable doubt." The district court also instructed the jury that "no juror should surrender his or her honest conviction as to the weight or the effect of the evidence to his fellow or her fellow jurors or for the purpose of returning a verdict." This Court has held that such language is a necessary part of an *Allen* charge and negates coercion. *See, e.g., Smalls,* 191 F.3d at 279–80. The district court informed the jury that the court's instructions were intended only to provide guidance to help resolve the differences that prevented the jurors from reaching a verdict. At the same time, the district court informed the jurors that they were free to disregard the *Allen* charge and that they need deliberate only so long as they reasonably believed they could "conscientiously reach an agreement." The district court also instructed the jurors to inform the court when they believed that further deliberations would not be beneficial. The mere fact that the district court reminded the jurors of their oaths and responsibility to deliberate and attempt to render a true verdict does not render the charge coercive. *See People v. Pagan,* 45 N.Y.2d 725, 727, 408 N.Y.S.2d 473, 380 N.E.2d 299 (1978) ("[A] trial court may properly discharge its responsibility to avoid mistrials by encouraging jurors to adhere to their oaths . . . .").

Edmund Panek argues that the *Allen* charge was impermissibly coercive because the district court stated that:

Each juror who finds him or herself in a minority should consider his or her view in light of the opinion of the jurors in the majority; conversely, each juror finding him or herself in the majority should give equal consideration of the view of the minority.

However, this Court has approved language directing jurors to consider the views of other jurors without abandoning their own conscientious opinions. *United States v. Melendez,* 60 F.3d 41, 52 (2d Cir.1995), *vacated on other grounds by Colon v. United States,* 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996). Moreover, other circuits have sanctioned this general language. *United States v. Hernandez–Albino,* 177 F.3d 33, 38 (1st Cir. 1999) (holding that *Allen* charges should direct both the majority and the minority to re-examine their positions so that the burden of reconsideration is not entirely on the minority); *United States v. Frost,* 125 F.3d 346, 374–75 (6th Cir.1997) (holding that language directing both majority and minority jurors to reconsider their positions is "critical to any *Allen* charge").

Edmund Panek also argues that the district court improperly instructed the jurors that:

this has been a fairly long trial, about three weeks, and at some considerable expense and money and human effort, so if your deliberations do not end in agreement on a verdict, the case is necessarily left open and undecided, and in all likelihood it would have to be tried again before another jury, a jury which would have to be selected in the same manner you were. There's no reason to believe that this case would be better tried or would reveal any more or different evidence than you have heard. Nor is

there any reason to believe that 12 different people would be more impartial or pay more attention to the evidence or make a greater effort to resolve the issues.

Because we have held that virtually identical language is not coercive, *United States v. Corcione,* 592 F.2d 111, 117 & n. 5 (2d Cir.1979); *see also United States v. Valencia,* 645 F.2d 1158, 1167 (2d Cir.1980), we reject this argument.

In sum, the district court should have afforded defense counsel the opportunity to review the *Allen* charge before administering it to the jury. However, we decline to reverse Edmund Panek's conviction, as he fails to demonstrate that he was prejudiced by the district court's error.

## IV. *Pro Tanto* Credit

Defendants-appellants argue that the district court erred by denying their request for *pro tanto* credit against all funds the government has already collected from their jointly and severally liable co-conspirators. Prior to the trial, defendants-appellants' co-conspirators pleaded guilty to Count One of the indictment, conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846. Pursuant to their respective plea agreements, the co-conspirators stipulated that the "gross proceeds" of the conspiracy amounted to $2,000,000 and that they would be jointly and severally liable for this amount. However, the jury concluded that the "gross proceeds [that] the defendants and their co-defendants and co-conspirators, collectively, obtained as a result of their narcotics violations [was] $400,000." Defendants-appellants sought an agreement from the government that any proceeds already collected from their co-conspirators would be credited, *pro tanto,* against their forfeiture liability. The government maintained that it would

not begin to credit the proceeds collected towards defendants-appellants' $400,000 liability until it had collected $1,600,000 from their co-conspirators. The district court held that "the Government is under no obligation to credit any monies received thus far from co-conspirators—presuming those monies total less than $1.6 million—toward the forfeiture amount owed by the Paneks."

 We find that this issue is not ripe for review. The ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Gary D. Peake Excavating Inc. v. Town Bd. of the Town of Hancock,* 93 F.3d 68, 72 (2d Cir.1996) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). "In determining whether a claim is ripe for review, we consider the fitness of the issues for review and the hardship to the parties of withholding review." *Id.* (citing *Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507).

Defendants-appellants' claims are not fit for judicial resolution at this time because the government has not collected more than $400,000 from defendants-appellants and their co-conspirators. *See United States v. Wilson,* 244 F.3d 1208, 1213–14 (10th Cir.2001) (holding that forfeiture order is not ripe for review until government seeks to enforce it in alleged violation of the defendant's rights). The government represents that it has collected only $176,274.28 from William Henry. While it is unclear whether the government has seized any of defendants-appellants' assets in partial satisfaction of their liability, the government also represents that the total forfeitures in this case do not exceed $400,000. Thus, even were Henry's forfeitures credited against defendants-appellants' liability of $400,000, the government

could still collect from defendants-appellants $223,725.72 minus the value of the assets, if any, they already have forfeited. For this reason, we also find that defendants-appellants would suffer no hardship by withholding review of this issue at this time. Accordingly, defendants-appellants have no justiciable claims unless and until the government attempts to seize assets from them that would place the total forfeiture amount in this case over $400,000.[8]

## V. The Government's Dismissal of the Money Laundering Charge

■ Finally, Edmund Panek argues that he was prejudiced with respect to Count One of the indictment, conspiracy to possess with intent to distribute and to distribute marijuana in violation of 21 U.S.C. § 846, because the government dismissed Count Two of the indictment, conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h), after claiming in its opening statement that "Edmund Panek was the brains of this organization .... [T]he evidence will show that Edmund Panek was the money man for this organization... [and that] Edmund maintained bank accounts in business names and he helped to clean up the drug money in this organization...." In determining whether there was "spillover prejudice" from a dismissed count, this Court first looks at whether the evidence introduced in connection with the dismissed count was so inflammatory that it "would have tended to incite or arouse the jury into convicting the defendant on the

remaining counts." *United States v. Wapnick,* 60 F.3d 948, 953 (2d Cir.1995) (citations omitted). The Court then considers whether the dismissed count and the remaining counts of the indictment arise from similar facts and whether the evidence introduced on the dismissed counts would have been admissible on the remaining counts. *Id.* at 954. Finally, the Court makes a "general assessment of the strength of the government's case on the remaining counts." *Id.* In short, a defendant is only likely to succeed on a claim of prejudicial spillover when

> evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts....

*Id.* (quoting *United States v. Rooney,* 37 F.3d 847, 856 (2d Cir.1994)).

■ We are concerned that the government charged Edmund Panek with conspiracy to launder monetary instruments and argued in its opening statement that he "helped to clean up the drug money in this organization," but then dismissed this count of the indictment against him at the close of its case-in-chief. Regardless, Edmund Panek cannot demonstrate that he was prejudiced by the government's opening statement, as it was not so inflammatory that it would have influenced the jury to convict Edmund Panek on the remaining count. *See Wapnick,* 60 F.3d at 954

---

8. We view with skepticism the government's position that it need not provide *pro tanto* credit to defendants-appellants until it collects $1,600,000 from their co-conspirators. In this case, the jury concluded that defendants-appellants and their co-conspirators collectively obtained $400,000 in gross proceeds from the marijuana conspiracy, and there is no indication that the government objected to the special verdict form. Were we to adopt the government's argument, the jury's determination that defendants-appellants are jointly and severally liable for $400,000 would become meaningless, as they alone would likely become liable for this entire amount, given the probability that the government will never collect more than $1,600,000 from their co-conspirators. Regardless, we reserve judgment on this issue.

(holding that evidence of structuring transactions to avoid currency transaction reporting requirements was not the type of evidence likely to arouse a jury). Moreover, the government's opening statement and evidence against Edmund Panek would have been admissible against him with respect to the marijuana conspiracy charge. *See Rooney,* 37 F.3d at 855 (holding that there is no prejudicial spillover when the evidence would have been admissible on the remaining counts of the indictment). Evidence that Edmund Panek maintained bank accounts in business names and laundered drug money would have been relevant to establish his knowledge of and participation in the marijuana conspiracy. *See, e.g., United States v. Orozco-Prada,* 732 F.2d 1076, 1079–81 (2d Cir.1984). The government also would have been entitled to introduce evidence of the limousine purchases, as well as their elaborate predicate transactions, to demonstrate the existence of unexplained cash, which may be indicative of a marijuana conspiracy. *See, e.g., United States v. Nersesian,* 824 F.2d 1294, 1325 (2d Cir. 1987); *United States v. Young,* 745 F.2d 733, 762–63 (2d Cir.1984). Accordingly, the dismissed money laundering conspiracy count did not result in spillover prejudice with respect to the marijuana conspiracy charge against Edmund Panek.

## CONCLUSION

Based upon the foregoing, the judgment of the United States District Court for the Northern District of New York is **AFFIRMED.**